UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH CANU,

    Plaintiff,

vs.                                                       Case No. 12-12838

NATIONAL LIFE INSURANCE COMPANY,        HON. AVERN COHN

    Defendant.
_____/

**MEMORANDUM AND ORDER
GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (Doc. 10)
AND DISMISSING CASE**

**I.  INTRODUCTION**

This is a disability insurance case.  Plaintiff Joseph Canu (Canu) is suing National Life Insurance Company (National Life) claiming that he is entitled to disability benefits under six insurance policies issued by National Life.  The insurance policies provide for either (1) total disability; or (2) partial/residual disability benefits if Canu is unable to work in his occupation as a chiropractor.  Now before the Court is National Life's motion for summary judgment on the grounds that Canu is not totally or partially disabled as defined by the policies, and, further, that Canu has not provided adequate proofs of loss to support a partial disability claim.  For the reasons that follow, the motion is GRANTED.  This case is DISMISSED.

**II. BACKGROUND**[1]

---

[1] On April 10, 2013, National Life filed a "Joint Statement Of Material Facts Regarding Defendant's Motion For Summary Judgment" (Doc. 17).  National Life asks the Court to

### A. Canu's Chiropractic Practice

Canu graduated from a chiropractic school in 1985 and opened up his own practice, the Rochester Chiropractic Clinic (the clinic), where he currently works. (Doc. 12-1 at 6, Canu Dep.). Since 2003, other chiropractors have worked with Canu at the clinic. (*Id.* at 7). Currently, the clinic employs Dr. Paul Masalskis (Doc. 12-4 at 3, Masalskis Dep.), Dr. Melissa Glavich (Doc. 12-5 at 3, Glavich Dep.), and Dr. Andrew Formanczyk (Doc. 12-1 at 12, Canu Dep.).

### B. Canu's Claimed Disability

In late 2009, Canu underwent back surgery. (Doc. 11 at 6, Doc. 18 at 2). Canu was diagnosed with cervical lumbar herniation and failed lumbar fusion. He claims he is disabled under the terms of six insurance policies he holds that were issued by National Life. His treating physician, Dr. Steven Rapp, has opined that he is permanently and totally disabled from returning to work in any capacity. (Doc. 14 at 30–32). In addition, Canu visited a neurologist, Dr. Cesar Hidalgo, who has opined that Canu's injury is chronic and degenerative. (*Id.* at 27–29). Canu has also received chiropractic treatment from his coworker Masalskis.

### C. The Insurance Policies[2]

---

deem its undisputed material facts as admitted because Canu did not respond to National Life's initial filing. However, on April 15, 2013, Canu filed "Plaintiff's Response To Defendant's Statement Of Facts In Support Of Motion For Summary Judgment" (Doc. 18). As such, to the extent that Canu disputes certain facts, National Life's undisputed facts will not be deemed admitted on that basis alone, but will be analyzed based on the evidence submitted to support each fact.

[2] The parties did not provide the insurance policies as exhibits or otherwise as part of the record. The terms of the policies are taken from National Life's material facts not in dispute, which Canu agrees represent the terms of the policies.

The insurance policies provide monthly benefits in the event that Canu becomes either "totally disabled," or "residually disabled," as defined by the policies. The following is a list of the policies:

NLX199931500 ("NLX500");

NLX210284700 ("NLX700");

NLX19993800 ("NLX800");

NLX210284900 ("NLX900") (collectively, the NLX-series policies);

and

NLD485476 ("NLD476"); and

NLD4855474 ("NLD474") (collectively, the NLD-series policies).

The NLX-series and NLD-series policies define disability slightly different but are substantively similarly. The NLX-series policies define disability as follows:

> **Total Disability**. The Insured shall be deemed totally disabled only if the Insured . . . is unable to perform the material and substantial duties of the Insured's occupation due to . . . accidental injury . . . or . . . sickness.
>
> . . . .
>
> **Partial Disability**. The Insured shall be deemed partially disabled only if, due to accidental injury or due to sickness, the Insured is not able:
> 1. to perform one or more of the important daily duties of the Insured's occupation as defined in this policy; and
> 2. to engage in the Insured's occupation as defined in this policy for as much time as was usual prior to the start of disability.
>
> For the Insured to be deemed partially disabled:
> 1. such disability must result in a Loss of Earnings per Month, of at least 20% of Adjusted Prior Average Earnings per Month; and
> 2. the Insured must be under the prudent care of a

> licensed physician. The physician must be someone other than the Insured.

The NLD-series policies define disability as follows:

> "Total disability" and "totally disabled" mean:
> 1. injury or sickness restricts your ability to perform the material and substantial duties of your regular occupation to an extent that prevents you from engaging in your regular occupation; and
> 2. you are receiving medical care from someone other than yourself which is appropriate for the injury or sickness. We will waive this requirement when continued care would be of no benefit to you.
>
> "Residual disability" and "residually disabled" during the Elimination Period mean:
> 1. injury or sickness does not prevent you from engaging in your regular occupation, but does restrict your ability to perform the material and substantial duties of your regular occupation:
>     a. for as long as you customarily performed them before the injury or sickness; or
>     b. as effectively as you customarily performed them before the injury or sickness; and
> 2. you are receiving medical care from someone other than yourself which is appropriate for the injury or sickness. We will waive this requirement when continued care would be of no benefit to you.
>
> After the Elimination Period has been satisfied, 'Residual Disability' and 'residually disabled' then mean that as a result of the same injury or sickness which caused you to satisfy the Elimination Period:
> 1. you experience at least a 20% loss of income in your regular occupation; and
> 2. you are receiving medical care from someone other than yourself which is appropriate for the injury or sickness. We will waive this requirement when continued care would be of no benefit to you.

### D. The Claims Process

4

### 1. Canu's Total Disability Claim Granted

Following his back surgery in 2009, Canu submitted a claim to National Life for total disability benefits. (Doc. 11 at 6, Doc. 18 at 2). On January 7, 2010, Canu's claim for total disability benefits was approved. (Doc. 12-7 at 2).

### 2. National Life Learns Canu Continues to Work

On March 14, 2011, after National Life awarded Canu total disability benefits, its "field investigator" Todd Davis visited Canu's clinic and learned that Canu continued to work, at least on a part time basis. Davis memorialized his visit and his interview with Canu in a memorandum. (Doc. 12-9). He describes his visit to the clinic as follows.

When Davis first arrived at the Clinic, he "viewed a sign-in sheet with names listed which had boxes next to the names for the person to check off which doctor they were there to see. The sheet was approx[imately] 2/3 full and had 21 names . . . 8 were checked for Dr. Canu. . . ." (*Id.* at 2). The sheet was later replaced with another list that had six new names, five of which checked Canu as their doctor. (*Id.*). Further, Canu's availability for the day was posted at the front desk. (*Id.*).

Davis also spoke with Canu at length. Canu informed Davis that he was treating patients with the help of Dr. Glavich, that he was "trying to do a little bit and does some things, but he can't keep doing it, and needs to do nothing." (*Id.* at 3).

### 3. National Life Discontinues Canu's Total Disability Benefits

Following Davis's visit to the clinic, National Life discontinued Canu's total disability benefits because it concluded that Canu was gainfully employed as a chiropractor. In a letter from National Life to Canu dated May 16, 2011, National Life stated:

> Total Disability benefit payments have not been approved

5

> beyond May 1, 2011. It appears from a recent interview you have been working and therefore no longer meet the terms of your policies['] Total Disability provisions.
>
> . . . .
>
> In a recent interview you had with Todd Davis . . . you advised that you have been treating approximately 25 patients per shift. You also advised that after a day of working your back hurts and leg is swollen. Starting May 1, 2011, we are considering you to be disabled under the partial disability provisions of [the] policies. . . .
>
> . . . .
>
> Based on our review, the information in your claim file indicates you are able to perform some of the duties of your own occupation. Therefore, your claim . . . will remain open at this time, under the residual/partial disability provisions of your policies.[3]

(Doc. 12-2 at 3).

### 4. Canu Contests Decision Denying Total Disability

Canu wrote to National life some time in May of 2011, informing them that the only duties he performs are those of a supervisor/consultant/educator, and that he does not actually treat patients. Thus, Canu contested National Life's finding that he was not totally disabled under the policies.

### 5. National Life Continues to Request Proofs of Loss to Analyze Partial/Residual Disability Claim, Only

---

[3] National Life erroneously informed Canu that policies NLX800 and NLX900 did not provide for partial/residual disability benefits. Thus, it informed Canu that his claim for partial/residual disability benefits would remain open only under policies NLX500, NLX700, NLD476, and NLD474. However, in a letter dated May 27, 2011, National Life recognized the error and clarified that all six policies provided for partial/residual disability benefits. Thus, Canu's claim for benefits remained open under all six policies.

On May 27, 2011, the day after National Life received Canu's letter, it sent Canu a letter asking for specific information to determine whether Canu was entitled to partial/residual disability benefits under the six policies. Specifically, National Life asked Canu to verify his current duties by providing the following:

> 2009 and 2010 business and personal tax returns
>
> 2009 to present monthly [Current Procedure Terminology] CPT codes, in the format of Production summary reports with units, charges and totals added up
>
> Please provide in writing how Dr. Glavich and Dr. Baldwin are currently paid. Are they able to bill out on their own? If no how are the patients they see billed? Is there a signed agreement? If yes, please send a copy. How do you keep track of how many patients are seen by each doctor?

(Doc. 12-3 at 5).

### 6. The "CPT" Codes

The CPT codes that National Life asked Canu to provide are input codes used in the clinic's billing software, "eThomas." (Doc. 12-4 at 8-9, Masalskis Dep.; Doc. 12-5 at 5-6, Glavich Dep.). The codes track productivity, *i.e.* the doctor performing the procedure and the specific procedure performed on a given day. Thus, the CPT codes are important for National Life to see what days Canu worked, and what procedures he performed on patients. This information was relevant to National Life's determination of whether Canu was actually disabled as defined by the policies, or, whether Canu was able to continue his work as a chiropractor.

In response to National Life's request for Canu's CPT codes for specific time frames, Canu provided the CPT codes for the entire clinic to National Life. In other words, the CPT codes were the same for all of the doctors at the clinic. Therefore, National Life was unable

to decipher which patients were seen by Canu as opposed to another doctor at the clinic. Canu's position was that individual CPT codes are not available. This is because, according to Canu, the other doctors do not have their own National Provider Identifier (NPI) numbers, *i.e.* billing identification numbers. Thus, Canu says that the billing software does not accurately reflect the days that he worked, as opposed to other doctors, because the other chiropractors billed using Canu's NPI number. As Canu stated at his deposition, "[E]verything that got billed out was just under my authorization code . . . whether I did the service or not." (Doc. 12-1 at 25, Canu Dep.).

On January 5, 2012, National Life requested that Canu provide CPT codes for his production only:

> We have completed our review of the production information you provided for 2009-2011. Upon review of this information, we note that the production is for the entire practice, not just for you. In order for us to continue with our review for reconsideration of benefits, we are in need of your CPT production reports, for only your production, for the period of January 1, 2009 to the present. 2009 and 2010 can be in annual format. January 2011 to the present should be in monthly format. This report must include the CPT code, description of the code, number of times each procedure was performed and the billing amount. Please provide us with this information as soon as possible.

(Doc. 12-16 at 3).

Canu, again asserting that individual CPT codes were unavailable in the billing system used by the clinic, failed to provide the requested information to National Life.

### 7. National Life Denies Partial/Residual Disability Claim

On March 9, 2012, National Life denied Canu's claim for partial/residual disability benefits under all six policies. (Doc. 12-18).

8

On May 22, 2012, National Life contacted Canu and informed him that it would accept patient sign-in sheets in lieu of providing individual CPT codes in order to consider whether Canu was entitled to partial/residual disability benefits. However, Canu informed National Life that he would not provide the sign-in sheets because they contained confidential patient information. (Doc. 12-20). Therefore, on May 25, 2012, National Life affirmed the denial of benefits. (*Id.*).

## E. This Case

On May 29, 2012, Canu filed suit in Oakland County Circuit Court. National Life removed the case on June 27, 2012 invoking the Court's diversity jurisdiction. Canu claims National Life breached the disability insurance policies by denying his claim. He says he is totally disabled under the policies.

## III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

9

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support a fact.

Fed. R. Civ. P. 56(c)(1).

The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike Cnty. Bd. of Ed.*, 286 F.3d 366, 370 (6th Cir. 2002).

## IV. DISCUSSION

### A. The Law

Under Michigan law, insurance contracts are interpreted under the well-established

principles of contract interpretation. *Singer v. Am. States Ins. (After Remand)*, 245 Mich. App. 370, 374 (2001). The central inquiry is to determine the intent of the parties. *Conagra v. Farmers State Bank*, 237 Mich. App. 109, 132 (1999). Thus, disability insurance policies must be read "as a whole," giving meaning to all of the terms. *Auto-Owners Ins. Co. v. Churchman*, 440 Mich. 560, 566 (1992); *see also Wojciechowski v. Franklin Life Ins. Co.*, No. 228683, 2002 WL 1803918, at *2 (Mich. Ct. App. 2002) ("[T]he court must look at the contract as a whole and give meaning to all terms. . . . This Court cannot create ambiguity where none exists.") (*citing Churchman*, 440 Mich. at 566–67). Where the policy is unambiguous, its construction is a question of law for the court. *Henderson v. State Farm Fire & Cas. Co.*, 460 Mich. 348, 353 (1999).

### B. The Motion

National Life moves for summary judgment and asserts that Canu (1) is not entitled to total disability benefits because he is not "totally disabled" as defined by the policies; and (2) is not entitled to partial/residual disability benefits because (a) he did not provide the necessary proofs of loss and (b) he is not currently under the care of a doctor, which National Life says is a requirement under the policies. The Court agrees that there are no genuine issues of material fact that Canu is not entitled to total or partial/residual disability benefits. The reasons follow.

### C. Total Disability

**1.**

National Life says that there is no question of material fact that Canu is not totally disabled because he has been performing chiropractic care in some capacity at the clinic from 2009 through the present date. National Life is correct.

As stated above, the policies provide that Canu is totally disabled if he is "unable to perform the material and substantial duties of [his] occupation due to . . . accidental injury . . . or . . . sickness." The evidence undisputedly establishes that Canu was performing, at least some of, the material and substantial duties of his occupation at the time National Life denied his claim. Therefore, there is no question that Canu does not meet the requirements of "total disability" under the policies.

**2.**

National Life correctly states that the "total disability" provisions in the policies must be read together with the "partial/residual disability" provisions. As other courts have held, when a policy provides for both "total" and "residual" disability insurance benefits, the terms must be read in conjunction with one another. When total and residual disability are read together in an insurance policy such as the one here, total disability requires that the insured be unable to perform *all* of his significant duties of his occupation. *See, e.g.*, *Miller v. Northwestern Mut. Life Ins. Co.*, 392 F.3d 973 (8th Cir. 2004); *Dym v. Provident Life and Acc. Ins. Co.*, 19 F. Supp. 2d 1147, 1149–50 (S.D. Cal. 1998). Any other interpretation would render the policies' residual disability provisions nugatory. Such an interpretation would be inconsistent with Michigan's requirement that insurance contracts be read as a whole so as to give effect to every provision. *Churchman*, 440 Mich. at 566.

**3.**

Here, by his own admission, Canu has provided chiropractic care at the Clinic since 2009. (Doc. 12-1 at 26, Canu Dep.). Indeed, Canu admitted to providing chiropractic care to "five to ten" patients a week since 2009. (*Id.*). Canu admitted that taking x-rays, performing exams, and providing patient diagnoses, all tasks that he was performing, are

substantial duties in chiropractic practice. (*Id.* 10–12).

Canu's coworker, Masalskis, also testified at his deposition that he witnessed Canu treat patients "here and there." (Doc. 12-4 at 6, Masalskis Dep.). At most, Masalskis saw Canu treat four or five patients in one day. (*Id.* at 7). Masalskis also treated Canu and testified that, in his opinion, Canu is able to treat up to ten patients a day:

> Q: . . . You've indicated during some of Mr. Liepshultz's questioning that you treated Dr. Canu as a chiropractor, and you are familiar with his occupational requirements and demands of the occupation of chiropractic, not only because you are a chiropractor, but you know exactly the kinds of chiropractic medicine Dr. Canu practiced; is that fair?
>
> A: Yes.
>
> Q: So when you indicate that, in your opinion, Dr. Canu would be able to see a maximum of ten patients per day, am I correct in understanding that opinion that you developed is based upon, A, your particular examination of Dr. Canu and, B, your knowledge of exactly what the demands of his occupation are?
>
> A: Yes.

(*Id.* at 8).

Canu misplaces his reliance on *Everhart v. State Life Ins. Co.*, 154 F.2d 347 (6th Cir. 1946) to support his position that he is entitled to total disability benefits. In *Everhart*, the Sixth Circuit, when determining whether an insured was totally disabled under the terms of an insurance policy, reasoned that the parties could not have intended that the insured "must have become so utterly helpless as to be incapable of performing work of any kind for remuneration or profit." *Id.* at 354. The *Everhart* court of appeals further reasoned that *United States v. Spaulding*, 293 U.S. 498 (1934) "recognized that a man may have worked

when really unable to do so and at the risk of endangering his health or life; and that, therefore, occasional work by one generally disabled because of impairment of mind or body does not as a matter of law gainsay total permanent disability." *Id.* at 355.

Here, unlike *Everhart*, the explicit terms of the policy show that the parties intended that Canu be unable to perform *all* of the material and substantial duties of his occupation in order to be "totally disabled." Allowing Canu to perform some of his duties, and still claim total disability under the policies, would render the residual/partial disability provisions in the policies meaningless. That is not what the parties intended. That Canu is acting against the advise of doctors makes no difference. The fact is that Canu is engaging in some of the material and substantial duties of his occupation, and, as such, does not meet the policies' definitions of total disability.

Because there is no genuine issue of material fact that Canu was not, and is not, "totally disabled" under the policies, the only remaining question is whether Canu was entitled to partial/residual disability benefits.

### D. Partial/Disability

### 1.

National Life says it is entitled to summary judgment on Canu's claim for residual/partial disability because Canu failed to submit proper proofs of loss to support his claim. The policies provide that written proof must be given to National Life within 90 days of when the benefits are payable. Alternatively, National Life says Canu is not under the care of a physician, and, therefore, does not meet the policies' definition of partial or residual disability. The Court agrees with National Life that Canu failed to submit proper proofs of loss. Thus, the Court does not decide whether Canu's unilateral decision to

disregard the instructions of his treating physician precludes recovery of benefits under the policies.

**2.**

As explained above, partial/residual disability under the policies generally requires Canu to be unable to perform one or more of his important daily duties, which leads him to work less than he was able to work in his occupation prior to the disability. Here, Canu failed to provide National Life with necessary proofs to determine whether he is entitled to benefits.

The purpose of submitting proofs of loss is to "allow the insurer to make a timely investigation in order to evaluate claims and . . . to determine with certitude that the insured demands payment under the policy, the amount of the claim, and the question of its liability." *Dellar v. Frankenmuth Mut. Ins. Co.*, 173 Mich. App. 138, 145–46 (1988) (citation omitted). "Michigan law requires only 'substantial compliance' with the proof-of-loss requirement" in an insurance contract. *Korn v. Paul Revere Life Ins. Co.*, 382 F. App'x 443, 447 (6th Cir. 2010) (citing *Westfield Ins. Co. v. Appleton*, 132 F. App'x 567, 574 (6th Cir. 2005); *Wineholt v. Cincinnati Ins. Co.*, 179 F. Supp. 2d 742, 748–49 (W.D. Mich. 2001) (Quist, J.); *Gibson v. Grp. Ins. Co.*, 142 Mich. App. 271 (1985)). Under Michigan law, " 'the insured should make a reasonable effort to provide information reasonably within its possession and with a sufficient degree of particularity to allow the insurer to make an informed review of the claim.' " *Id.* (citing *Wineholt*, 179 F. Supp. 2d at 752).

**3.**

As explained by National Life:

> There is no dispute that Plaintiff failed to submit to National Life

15

> the CPT production reports to document the extent of his chiropractic practice and to allow National Life to determine [whether Plaintiff] was entitled to residual disability benefits.
>
> Beginning in May, 2011, National Life repeatedly requested specific CPT production records containing only his production when Plaintiff returned to performing some of his important occupational office duties. Those CPT reports were necessary to determine whether he was eligible for Residual Disability benefits. It is undisputed that those CPT reports were available from the Clinic. It is undisputed that he refused to provide them. National Life is therefore entitled to summary judgment on any claim for Residual Disability benefits.

(Doc. 10 at 15–16, Def's. Mot. for Summ. J.) (internal citations to record omitted).

Canu says that it was not possible to submit individual CPT reports. His statement, however, is not supported by the evidence proffered by National Life. Masalskis testified at his deposition that, since he started working at the clinic in 2003, the billing software system tracked each doctor performing a particular chiropractic service. (Doc. 12-4 at 8, Masalskis Dep.). Masalskis agreed that "[t]he clinic keeps track of each Doctor of Chiropractic's production, meaning they monitor the number of patients they see, the particular CPT codes that they are treating under, the amount of money they are sending into insurance companies and, more importantly, the amount that the insurance companies are paying the clinic in reimbursement for the codes." (*Id.* at 10). Glavich, a recent addition to the clinic, also confirmed that the clinic tracks each individual chiropractor's production and CPT codes. (Doc. 12-5 at 6, Glavich Dep.).

Further, even if Canu is correct that individual CPT reports are unavailable under the clinic's current billing system, National Life gave Canu the opportunity to submit the clinic's sign-in sheets as proof to support his partial/residual disability claim.

Canu declined to do so. Canu again provides a reason why he did not produce the

16

sign-in sheets:

> For legal reasons, Dr. Canu recognized the importance of having a spot for patients to denote which doctor they were seeing. However, Dr. Canu has many patients who still attend the Clinic that he is unable to treat himself. As a result, many patients note in the sign-in sheet that they are seeing him. In reality, he may do the initial intake and diagnosis, but the actual treatment is administered by Dr. Galvich, who is not yet licensed and can only practice under the supervision of a licensed practitioner.

(Doc. 14 at 8, Pl's. Resp. Br.). In addition, Canu cited privacy reasons to support his refusal to disclose the sign-in sheets.

Canu's reason for not providing the sign-in sheets, however, is irrelevant. Canu has not provided National Life with any of the requested materials so that it can determine whether Canu is entitled to partial/residual disability benefits. Without the proofs of loss, National Life cannot determine whether Canu is disabled, as defined by the policies, and is not required to pay benefits.

Finally, Canu says he provided National Life with an accounting report showing that he suffered a loss in 2010 and 2011 as a result of his inability to work. The Court is not persuaded that the accounting report satisfies Canu's duty to provide proof that his condition affected his ability to work. There are many other factors that could have caused Canu's business to decline in 2010 and 2011. Unlike the CPT reports and the sign-in sheets that National Life requested and Canu failed to provide, the accounting report fails to show how often Canu worked before and after his claimed disability, and the types of procedures he performed on patients. Further, as National Life correctly states, Canu's submission of the accounting report

> is immaterial because the Policies require Plaintiff to submit

> proof of loss within 90 days of his claim, which he undisputedly ***did not do.*** Assuming *arguendo* Plaintiff's [accounting report] constituted "proof of loss" (which it does not), it was first provided with his Response on March 27, 2013, or *3 years* after proof of loss was due.

(Doc. 16 at 7, Def's. Reply Br.) (emphasis in original) (internal citations to record omitted).

In sum, no reasonable juror can conclude that Canu substantially complied with the proof-of-loss requirement in the policies. As such, National Life is entitled to judgment on the partial/residual disability claim.

## V. CONCLUSION

For the reasons discussed above, National Life's motion for summary judgment has been granted. There is no genuine issue of material fact that Canu (1) was not "totally disabled," as defined by the policies; and (2) did not submit adequate proofs of loss in support of a partial/residual disability claim.

SO ORDERED.

           S/Avern Cohn
           AVERN COHN
           UNITED STATES DISTRICT JUDGE

Dated: May 6, 2013

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, May 6, 2013, by electronic and/or ordinary mail.

           S/Sakne Chami
           Case Manager, (313) 234-5160